**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. _____

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

v.

**ALL FUNDS RESTRAINED AND ON DEPOSIT IN JP MORGAN CHASE BANK ACCOUNT NUMBER 781288607; ALL FUNDS RESTRAINED AND ON DEPOSIT IN REGIONS BANK ACCOUNT NUMBER 0325600907; AND ALL FUNDS RESTRAINED AND ON DEPOSIT IN TRUIST BANK ACCOUNT NUMBER 1100019575940,**

      **Defendants *In Rem*.**

**VERIFIED COMPLAINT FOR FORFEITURE *IN REM***

Plaintiff, the United States of America, by and through its undersigned counsel, alleges:

**I.  NATURE OF THE ACTION**

1. This is a civil action *in rem*, pursuant to 18 U.S.C. § 981(a)(1)(A), (C), the procedures set forth in Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, the Federal Rules of Civil Procedure, to forfeit assets that constitute gross proceeds of health care fraud, property involved in money laundering, or property traceable to such property.

2. The assets consist of three restrained bank accounts more particularly described below:

1

    a. Approximately $56,529.91 restrained and on deposit in JP Morgan Chase Bank account number 781288607 in the name of SPK Medical Supplies LLC ("SPK");

    b. Approximately $19,739.65 restrained and on deposit in Regions Bank account number 0325600907 in the name of Multi Services by Leunan Inc. ("Multi Services"); and

    c. Approximately $2,229.20 on deposit in Truist Bank account number 1100019575940 in the name of Solutions Care Espinosa Inc. ("Solutions")

(collectively, the "Defendant Currency").

## II. JURISDICTION AND VENUE

3. This Court has jurisdiction over the subject matter. *See* 28 U.S.C. §§ 1345, 1355(a).

4. This Court has *in rem* jurisdiction over the Defendant Currency. *See* 28 U.S.C. §§ 1345, 1355(a). The Defendant Currency was seized and is in the custody of the United States.

5. Venue for this action is proper in the Southern District of Florida, because acts or omissions giving rise to the forfeiture occurred in this District. *See* 28 U.S.C. § 1355(b)(1).

## III. FACTUAL ALLEGATIONS

### A. The Medicare Program

6. The Medicare Program ("Medicare") was a federal program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled. The benefits available under Medicare were prescribed by statute and by federal regulations under the auspices of the United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"). Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

7. Medicare was a "health care benefit program," as defined in Title 18, United States Code, Section 24(b).

8. Part B of the Medicare Program was a medical insurance program that covered, among other things, certain physician and outpatient services, and other health care benefits, items, and services, including durable medical equipment ("DME"), that were medically necessary and ordered by licensed medical doctors or other qualified health care providers. DME is equipment that is designed for repeated use and for a medical purpose, such as prosthetic limbs, back braces, knee braces, and wheelchairs.

9. For Florida beneficiaries, Medicare Part B's insurance concerning DME and related health care benefits, items, and services, was administered by CGS Administrators, LLC ("CGS") pursuant to a contract with HHS. Among CGS's responsibilities, it received, adjudicated, and paid the claims of authorized DME suppliers that were seeking reimbursement for the cost of DME and other health care benefits, items, or services supplied or provided to Medicare beneficiaries.

10. DME companies, physicians, and other health care providers that sought to participate in Medicare Part B and bill Medicare for the cost of DME and related benefits, items, and services were required to apply for and receive a National Provider Identifier number ("NPI"). In the application, the provider acknowledged that to be able to participate in the Medicare program, the provider must comply with all Medicare-related laws and regulations.

11. The NPI allowed a DME company to submit bills, known as "claims," to Medicare to obtain reimbursement for the cost of DME and related health care benefits, items, and services that a DME company had supplied to beneficiaries.

12. Medicare permitted DME companies to submit claims for reimbursement electronically. Each claim required certain important information, including: (a) the Medicare

beneficiary's name; (b) the Medicare beneficiary's identification number; (c) the name and NPI of the doctor or other qualified health care provider who ordered the health care benefit, item, or service that was the subject of the claim; (d) the health care benefit, item, or service that was provided or supplied to the beneficiary.

13. Under Medicare rules and regulations, DME or other related health care benefits, items, or other services must be medically necessary and ordered by a licensed doctor or other licensed, qualified health care provider in order to be reimbursed by Medicare. When electronically submitting a claim, the provider certified that the contents of the form were true, correct, and complete, and that the form was prepared in compliance with the laws and regulations governing the Medicare Program.

14. Medicare, through CGS, generally would pay a substantial portion of the cost of the DME or related health care benefits, items, and services that were medically necessary and ordered by licensed doctors or other qualified health care providers.

15. Payments under Medicare Part B were often made directly to the DME company rather than to the patient/beneficiary. For this to occur, the beneficiary would assign the right of payment to the DME company or other health care providers. Once such an assignment took place, the DME company would assume the responsibility for submitting claims to, and receiving payments from, Medicare.

### B. The Companies

16. SPK was a Florida company with a principal place of business in Palm Beach County, Florida. It was organized on or about October 28, 2021. It was purportedly in the business of supplying DME to Medicare beneficiaries. As of March 24, 2022, SPK was eligible to receive payments from Medicare for DME supplied to beneficiaries, if the DME was medically necessary.

17. Multi Services was a Florida company with a principal place of business Miami-Dade County, Florida. It was organized on or about February 10, 2022.

18. Solutions was a Florida company with a principal place of business Miami-Dade County, Florida. It was organized on or about February 10, 2022.

19. Leunan de la Nuez Espinosa ("Espinosa") was at all relevant times the registered owner of SPK, Multi Services, and Solutions.

### C. The Health Care Fraud Scheme

20. Beginning on or about June 8, 2022, and continuing through on or about August 10, 2022, Espinosa submitted and caused the submission of false and fraudulent Medicare claims on behalf of SPK, seeking approximately $3,451,168.00 for DME that was neither ordered by a medical provider, nor provided to the beneficiary as claimed.

21. More specifically, Espinosa caused the submission of the false and fraudulent Medicare claims described below, among other claims:

| Beneficiary | Purported Service Date | Approx. Claim Date | DME | | | Approx. Amount Claimed |
|---|---|---|---|---|---|---|
| | | | QTY | Code | Description | |
| M.R. | 3/28/22 | 6/8/22 | 270 | A6021 | Collagen dressing, sterile, size 16 sq. in. or less, each | $6,944.00 |
| T.E. | 4/13/22 | 6/22/22 | 270 | A6021 | Collagen dressing, sterile, size 16 sq. in. or less, each | $6,944.00 |
| H.M. | 4/5/22 | 6/14/22 | 270 | A6021 | Collagen dressing, sterile, size | $6,944.00 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | 16 sq. in. or less, each | |
| W.O. | 4/8/22 | 6/20/22 | 270 | A6021 | Collagen dressing, sterile, size 16 sq. in. or less, each | $6,944.00 |
| D.B. | 3/31/22 | 6/10/22 | 270 | A6021 | Collagen dressing, sterile, size 16 sq. in. or less, each | $6,944.00 |
| C.S. | 4/28/22 | 7/8/22 | 270 | A6021 | Collagen dressing, sterile, size 16 sq. in. or less, each | $6,944.00 |
| S.H. | 4/28/22 | 7/8/22 | 270 | A6021 | Collagen dressing, sterile, size 16 sq. in. or less, each | $6,944.00 |
| L.P. | 4/28/22 | 7/8/22 | 270 | A6021 | Collagen dressing, sterile, size 16 sq. in. or less, each | $6,944.00 |
| R.H. | 4/28/22 | 7/8/22 | 270 | A6021 | Collagen dressing, sterile, size 16 sq. in. or less, each | $6,944.00 |
| D.M. | 4/29/22 | 7/8/22 | 270 | A6021 | Collagen dressing, sterile, size 16 sq. in. or less, each | $6,944.00 |

22.     Law enforcement interviewed several of the beneficiaries billed by SPK, and the beneficiaries told law enforcement that they were not familiar with the prescribing medical provider, had never been treated by them, never received the items, and never had a need for any of these items.

23. Law enforcement also interviewed all three of the medical professionals listed on the claims submitted by SPK to Medicare. One of the nurse practitioners told law enforcement that she had not been a practicing clinical nurse practitioner for over 12 years, and the other two medical professionals reviewed their practice records and confirmed that they had never prescribed anything to the beneficiaries on the claims.

24. Based on these and other false and fraudulent claims, Medicare paid SPK approximately $1,096,800.00, which represents the proceeds of the health care fraud scheme.

25. Espinosa used the proceeds of the health care fraud for his personal use and benefit, and to further the fraud.

26. From June 2022 through July 2022, approximately $609,589.58 of the Medicare reimbursements representing the health care fraud proceeds were deposited directly into account number 781288607 at JP Morgan Chase Bank held in the name of SPK (the "SPK Bank Account"). Espinosa was the sole signatory for this account. No other funds were deposited into this account during this time period.

27. Espinosa then negotiated the following checks made payable to Espinosa's other companies, Multi Services and Solutions, and drawn on the SPK Bank Account involving the proceeds received from the health care fraud scheme:

| **Approx. Date** | **Payee** | **Check No.** | **Approx. Amount** |
| --- | --- | --- | --- |
| 7/5/22 | Solutions | 1015 | $18,923.00 |
| 7/5/22 | Multi Services | 1018 | $22,219.00 |
| 7/8/22 | Solutions | 1037 | $14,191.00 |
| 7/8/22 | Multi Services | 1040 | $19,128.00 |
| 7/14/22 | Solutions | 1047 | $17,320.00 |
| 7/14/22 | Multi Services | 1049 | $16,317.00 |
| 7/21/22 | Solutions | 1060 | $22,697.00 |

28. The checks payable to Multi Services were deposited into Regions Bank account number 0325600907 in the name of Multi Services.

29. The checks payable to Solutions were deposited into Truist Bank account number 1100019575940 in the name of Solutions.

30. Espinosa was the sole signatory for both accounts.

31. No other funds were deposited into these accounts during this time period.

### D. Criminal Case

32. On or around September 6, 2022, a federal grand jury returned an Indictment charging Espinosa in Counts 1-15 with health care fraud, Counts 11-13 with aggravated identity theft, and Counts 14-20 with money laundering. *See U.S. v. Espinosa*, Case No. 9:22-cr-80138, ECF No. 1.

33. On or around September 8, 2022, the Court entered a Protective Order for Assets Subject to Forfeiture, enjoining and restraining the Defendant Currency.

34. On or around November 7, 2022, the Court entered an Order transferring Espinosa to fugitive status. *Id.* at ECF No. 7.

### IV. BASIS FOR FORFEITURE

35. Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to a specified unlawful activity or a conspiracy to commit such offense is subject to civil forfeiture.

36. Pursuant to 18 U.S.C. § 1956(c)(7)(F), any act or activity constituting an offense involving a "Federal health care offense" constitutes a specified unlawful activity.

37. Pursuant to 18 U.S.C. § 1347 and 1349, health care fraud each is a "Federal health

care offense."

38. Pursuant to 18 U.S.C. § 1347, it is a federal crime to "knowingly and willfully execute[ ], or attempt[ ] to execute, a scheme or artifice—(1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services".

39. Pursuant to 18 U.S.C. § 981(a)(1)(A), "any property, real or personal, involved in a transaction in violation of [18 U.S.C. § 1957], or any property traceable to such property" is subject to forfeiture to the United States.

40. Pursuant to 18 U.S.C. § 1957, it is a federal crime to "knowingly engage[ ] or attempt[ ] to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity".

## FIRST CLAIM
**Proceeds of Health Care Fraud Offense**
**(18 U.S.C. § 981(a)(1)(C))**

41. The factual allegations in paragraphs 1 to 40 are re-alleged and incorporated by reference herein.

42. As set forth above, the Defendant Currency constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the Federal health care offense.

43. Accordingly, the Defendant Currency is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

## SECOND CLAIM
### Property Involved in Laundering Transactions Greater Than $10,000
### (18 U.S.C. § 981(a)(1)(A))

44. The factual allegations in paragraphs 1 to 40 are re-alleged and incorporated by reference herein.

45. As set forth above, the Defendant Currency was involved in transactions in property of a value greater than $10,000 that was derived from specified unlawful activity in violation of 18 U.S.C. § 1957, and/or constitutes property traceable to such property.

46. Accordingly, the Defendant Currency is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

**WHEREFORE**, Plaintiff, the United States of America, requests: notice of this action be provided to persons known or thought to have an interest in or right against the Defendant Currency; the Defendant Currency be forfeited and condemned to the United States; and such other and further relief as this Honorable Court may deem just, necessary, and proper.

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By:   /s/ Sara M. Klco
Sara M. Klco
Assistant United States Attorney
Asset Forfeiture Division
(305) 961-9165
Sara.Klco@usdoj.gov

*Counsel for United States of America*

## **VERIFICATION**

I, Radu V. Pisano, hereby verify and declare, under penalty of perjury, that I am a Special Agent with United States Department of Health and Human Services, Office of Inspector General ("HHS-OIG") and that the foregoing factual allegations are true and correct to the best of my knowledge and belief. The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case, together with others, as a Special Agent of HHS-OIG

Executed on this ___ day of _____, 2024.

_____
Radu V. Pisano
Special Agent
HHSOIG